UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.          ) | No. 1:20-cr-00043-DRL-SLC |
| ) | |
| ALLAN J. O'GRADY      ) | |

## REPORT AND RECOMMENDATION

Before the Court is a motion to suppress evidence filed by Defendant Allan J. O'Grady. (ECF 23). Defendant seeks to suppress evidence seized from his vehicle and person, which he claims was obtained as a result of an unlawful search and seizure in violation of the Fourth and Fourteenth Amendments. (*Id.*). Defendant also seeks to suppress certain statements allegedly obtained in violation of his Fifth Amendment *Miranda* rights. (ECF 45).

### A. Background

On July 22, 2020, Defendant was indicted for allegedly possessing a firearm as a felon. (ECF 1). He was subsequently arrested on July 23, 2020. Defendant then filed the pending motion to suppress on August 12, 2020 (ECF 23), to which the Government responded on August 18, 2020 (ECF 25). On August 14, 2020, the District Judge referred this matter to the undersigned Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1) and this Court's Local Rule 72-1. (ECF 24).

On November 9, 2020, the Court conducted an evidentiary hearing with respect to the motion to suppress.[1] (ECF 42). On January 7, 2021, Defendant filed a post-hearing brief in support of his motion (ECF 45), to which the Government responded on February 9, 2021 (ECF 46). Defendant filed a reply on February 23, 2021. (ECF 47). Accordingly, the matter is fully

---

[1] The Court will refer to the transcript of the hearing (ECF 44) as "Tr. __."

briefed and ripe for adjudication. After considering the evidence and argument submitted by the parties in this matter, I RECOMMEND that Defendant's motion to suppress (ECF 23) be DENIED.

## B. Findings of Fact

At the evidentiary hearing, the Government offered the testimony of Sergeant Mathew Blodgett of the Garrett Police Department. (ECF 43; Tr. 5). At the time of the hearing, Sergeant Blodgett had been employed by the Garrett Police Department for just over four years, with prior experience as a reserve officer in Auburn, Indiana; he was also a firearms instructor and an Indiana Law Enforcement Academy graduate. (Tr. 5-6, 25). Defendant offered no other testimony or evidence. The testimony of Sergeant Blodgett was not contested in any meaningful way at the hearing and was largely consistent with the video recording admitted into evidence. As such, I FIND his testimony to be entirely credible.

On February 2, 2020, Sergeant Blodgett was working as the second-shift sergeant, in full uniform, alone, in a fully marked SUV. (Tr. 8). At approximately 8:50pm, while his vehicle was stopped near a gas station on the 200 block of South Randolph Street in Garrett, Indiana, Sergeant Blodgett observed a white Chevy Trailblazer pass his location, as the driver—who Sergeant Blodgett later identified in open court as Defendant (Tr. 16-17)—appeared to be looking down at something (Tr. 10). Sergeant Blodgett decided to follow the Trailblazer and observed it travel left of center—that is, it crossed the center line painted on the road. (*Id.*). Sergeant Blodgett then activated his in-squad, dash-mounted camera ("Dash-Cam"), and continued to follow the Trailblazer.[2] The Government offered the Dash-Cam footage at the

---

[2] The Dash-Cam saves footage starting one minute prior to when it was activated. (Tr. 11). The audio does not begin recording until after the first minute of video has passed. (*Id.*).

hearing.³ Because the Super Bowl was being played at the time, Sergeant Blodgett believed that the driver of the Trailblazer may have been intoxicated. (Tr. 11).

While continuing to follow Defendant, Sergeant Blodgett paced Defendant's Trailblazer traveling at forty-two miles per hour in a zone with a posted speed limit of thirty-five miles per hour.⁴ (Tr. 12). Posted thirty-five miles per hour speed limit signs are visible on Sergeant Blodgett's Dash-Cam, as is his vehicle's speed as he paces Defendant. (Dash-Cam 20:53:31-20:55:00). Further, Sergeant Blodgett testified that his squad car's speedometer and radar are regularly calibrated.⁵ (Tr. 13-14). Sergeant Blodgett continued to follow Defendant and observed him traveling at forty-eight miles per hour in a forty miles per hour zone—again posted speed limit signs and Sergeant Blodgett's speed are visible on the recorded footage—and then stopping over a line at an intersection. (Tr. 15; Dash-Cam 20:55:00-20:57:00). As soon as Defendant turned out of the intersection, Sergeant Blodgett turned on his vehicle's emergency lights and initiated a traffic stop. (Tr. 16; Dash-Cam 20:55:00-20:57:00). He had been following Defendant less than four minutes. (Dash-Cam 20:53:31-20:57:00).

After the vehicle came to a stop, Sergeant Blodgett approached the driver's side window and began speaking with Defendant through the window. (Tr. 16-17). Sergeant Blodgett proceeded to explain that he had pulled Defendant over for speeding and crossing the center line and began asking questions about where Defendant had been, had he been drinking, and whether he owned the vehicle. (Dash-Cam 20:57:00-20:59:00). Defendant responded to each of these

---

³ The Dash-Cam footage was admitted as Government's Exhibit 3. (Tr. 24-25; *see also* ECF 43). When referring to the recording, the Court will cite to "Dash-Cam, 00:00:00."

⁴ More specifically, Sergeant Blodgett testified that he was unable to get a reading from his dash-mounted radar. (Tr. 12). However, he was able to reach forty-two miles per hour in his squad car, without gaining or losing ground between him and Defendant's Trailblazer. (*Id.*).

⁵ The Government admitted into evidence a certificate showing that Sergeant Blodgett's radar was certified and accurate as of October 19, 2019. (Tr. 13; ECF 43).

3

questions, explaining that he had been at a friend's house to watch the Super Bowl but had left at half-time. (*Id.*). He also provided Sergeant Blodgett with his license and registration when requested. (*Id.*). Defendant was the sole occupant of the vehicle, and Sergeant Blodgett testified that he smelled an odor of marijuana after putting his head through the driver's side window. (Tr. 16). He further testified that—based on his training and experience—he was aware of and knew the odor to be marijuana. (*Id.*). Sergeant Blodgett asked Defendant if there was a reason he smelled marijuana, to which Defendant responded that a friend had marijuana in the car earlier in the evening. (Tr. 17-18; Dash-Cam, 20:58:00-21:00:00).

After asking Defendant about the odor of marijuana, Sergeant Blodgett decided that he would search the Trailblazer and asked Defendant to step out of the vehicle. (Tr. 18; Dash-Cam 20:59:00-21:01:00). Sergeant Blodgett further testified that there was no shoulder to the road where the stop occurred and that he believed he and Defendant were at risk standing on the side of the car. (Tr. 18). Sergeant Blodgett explained to Defendant that—based on the smell—he was going to search the car and told Defendant that this was "his chance to be honest with [him]." (Tr. 30; Dash-Cam 20:59:00-21:01:00). Defendant responded that there was "a little bit of marijuana" in the car. (Tr. 19, 30; Dash-Cam 20:59:00-21:01:00). Defendant at this time was holding his cell phone in his hand and had called his mother on speakerphone. (Tr. 19; Dash-Cam 20:59:00-21:01:00). Sergeant Blodgett told Defendant to hang up the phone and that he would allow Defendant to call back later. (*Id.*). He also explained that he would not take Defendant to jail, even if there was "a little bit of marijuana" in the car. (*Id.*). Defendant remained on the phone, though, and Sergeant Blodgett attempted to answer his mother's questions about where the vehicle was stopped. (*Id.*). At this point in the encounter, Sergeant Blodgett testified that the tone of his conversation with Defendant was "cordial" and "calm" (Tr.

18), which the Dash-Cam footage corroborates (Dash-Cam 20:59:00-21:01:00). At no point in the encounter did Sergeant Blodgett raise his voice or unholster his firearm. (*Id.*). Sergeant Blodgett also testified, though, that at the time Defendant was ordered from the vehicle he was not free to leave. (Tr. 27).

Sergeant Blodgett testified that as Defendant continued to speak with his mother, he noticed a bulge in Defendant's front right pocket and was concerned it may be a firearm. (Tr. 19). Sergeant Blodgett quickly placed his hand on the bulge and testified that—based on his experience handling firearms—he recognized it to be a firearm. (*Id.*; Dash-Cam 21:00:00-21:02:00). Within a matter of seconds, Sergeant Blodgett asked Defendant, "What's this?" and Defendant immediately told his mother—who was still on the phone—"Mom, I'm going to jail. I love you." (*Id.*). Sergeant Blodgett, in a louder and more assertive voice, ordered Defendant to place his phone down and put his hands on his head, and proceeded to handcuff him behind his back. (Tr. 21; Dash-Cam 21:00:00-21:05:00). After Defendant was handcuffed, he asked Defendant if "he had been in trouble before," and then asked if the gun was loaded, to which Defendant replied that there was not a bullet in the chamber. (Tr. 20; Dash-Cam 21:00:00-21:05:00). Defendant asked how fast he was speeding, and Sergeant Blodgett again explained that he was driving seven miles over the speed limit and had crossed the center line. (Tr. 20-21; Dash-Cam 21:00:00-21:05:00). Sergeant Blodgett also asked if Defendant had noticed him pull behind him, which Defendant said he did not, before Sergeant Blodgett explained that he noticed Defendant's driving and thought he was intoxicated. (*Id.*). Sergeant Blodgett then proceeded to retrieve a Glock 34, 9mm handgun, with a 30 round magazine, as well as money from Defendant's pockets. (*Id.*).

Soon thereafter, additional officers arrived from the Garrett Police Department, and Defendant was placed in the rear of Sergeant Blodgett's squad car. (Tr. 21). One officer—Officer Straw—at some point read Defendant his *Miranda* rights, while Sergeant Blodgett and a separate officer—Detective Days—searched his vehicle. (*Id.*). While searching the vehicle, Sergeant Blodgett found a black backpack, which he unzipped revealing a "green, leafy substance, . . . a digital scale and . . . plastic bags." (Tr. 22). At no point did Defendant consent to the search of his vehicle, and prior to the stop, Sergeant Blodgett did not believe that Defendant was armed and dangerous, and there was no active warrant for Defendant's arrest. (Tr. 26-27). Sergeant Blodgett eventually returned to the vehicle and questioned Defendant about his prior criminal history as well as the marijuana and firearm. (Dash-Cam 21:20:00-21-21:45:00). Sergeant Blodgett also asked Defendant about whether he was dealing marijuana. (*Id.*).

In his motion to suppress, Defendant argues that Sergeant Blodgett searched him and seized the 9mm Glock "without lawful authority." (ECF 23 ¶ 2). In particular, Defendant argues that Sergeant Blodgett's reasons for stopping him were pretextual and that he was "ordered from his vehicle, unlawfully detained and was subjected to a pat down search, which was beyond the parameters of a routine traffic stop." (ECF 47 at 4). In his post-hearing brief, Defendant also asserts that any statements he made to Sergeant Blodgett should be suppressed, alleging such statements were made in violation of his *Miranda* rights. (ECF 45 at 4-5). He further alleges that any evidence obtained as a result of the search of his vehicle should be suppressed as the fruit of an unreasonable, warrantless search in violation of the Fourth and Fourteenth Amendments. (*Id.* at 5-6). Because Defendant advances multiple grounds for suppressing different statements and evidence, the Court will address each in turn.

*C.  Analysis*

1.  Stop of Defendant's Vehicle

As mentioned, Defendant asserts that "[a]t the time of his arrest, the police lacked probable cause that the Defendant was violating any law either federal, state or local." (ECF 23 ¶ 3.b).  Defendant also asserts that "[i]t is significant . . . that [Sergeant] Blodgett did not immediately stop [Defendant] for any infractions" and urges the Court to "consider the pretextual nature of the stop which is not totally irrelevant to the probable cause or reasonable suspicion determination." (ECF 47 at 3).

"As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996).  "An officer has probable cause for a traffic stop when [he] has an 'objectively reasonable' basis to believe a traffic law has been violated." *United States v. Dowthard*, 500 F.3d 567, 569 (7th Cir. 2007) (quoting *United States v. McDonald*, 453 F.3d 958, 961-62 (7th Cir. 2006)).  The Court must, therefore, focus on whether an officer had an objectively reasonable basis to believe a traffic violation had occurred.  *See United States v. Reeves*, 796 F.3d 738, 741 (7th Cir. 2015).  "Other actual motivations of the police officer bear no weight on the 'constitutional reasonableness' of traffic stops." *United States v. Smith*, 668 F.3d 427, 430 (7th Cir. 2012).

In this instance, there is little doubt that Sergeant Blodgett had probable cause to stop Defendant's vehicle.  Based on his hearing testimony and the Dash-Cam footage, Sergeant Blodgett at various times observed Defendant:  (1) drive over the posted speed limit, (2) cross over or onto the center line, and (3) stop over the painted white line, in an intersection.  Each of these acts could constitute a violation of Indiana law, and each independently could supply

probable cause to initiate a traffic stop.  *See* Ind. Code §§ 9-21-5-2 (setting speed limits), 9-21-8-2(b)(2) (requiring that vehicles be driven "as close as practicable to the right-hand curb or edge of the roadway"), 9-21-8-31 (requiring that vehicles be stopped "at the entrance to a through highway").  The fact that Sergeant Blodgett may have suspected that Defendant was driving while intoxicated or even that he had committed an even more serious crime does not negate the objective reasonableness of the stop.  *See United States v. Correa*, 908 F.3d 208, 214 (7th Cir. 2018) ("[W]e find that Correa's traffic violation (turning without signaling) gave the officers probable cause for the traffic stop.  That probable cause satisfies the Fourth Amendment's reasonableness requirement even if the officers were more interested in suspected drug trafficking than in dangerous driving on the streets of Chicago."); *United States v. Mosby*, 541 F.3d 764, 768 (7th Cir. 2008) ("[T]he officers' subjective motivation is irrelevant as long as they had probable cause to justify the seizure.").

In summary, there was nothing improper about the actual stop of Defendant's vehicle.  Accordingly, the undersigned will turn to Defendant's arguments concerning what occurred and was said following the stop.

2.  The Vehicle Search

Once Defendant's vehicle was stopped, Sergeant Blodgett had a brief conversation with him through the open window of the vehicle before ordering Defendant out of the vehicle for purposes of conducting a search.  Sergeant Blodgett testified, and the Dash-Cam footage confirmed, that Defendant was not ordered from the vehicle until after Sergeant Blodgett smelled marijuana.  Further, Defendant was not removed from the vehicle and the vehicle was not searched until after Defendant had admitted that a friend had marijuana in the car earlier in the

evening.[6]  Sergeant Blodgett also testified that he ordered Defendant from the vehicle for safety reasons so he could conduct a search.

While warrantless searches are generally *per se* unreasonable, "where there is probable cause to believe that a vehicle contains contraband or evidence of a crime, law enforcement may conduct a warrantless search of the vehicle." *United States v. Zahursky*, 580 F.3d 515, 521 (7th Cir. 2009); *see also Arizona v. Gant*, 556 U.S. 332, 338 (2009); *Carroll v. United States*, 267 U.S. 132, 153-56 (1925).  The scope of the so called "automobile exception" is defined "not by the nature of the 'container in which the contraband is secreted' but 'by the object of the search and the places in which there is probable cause to believe that it may be found.'" *United States v. Kizart*, 967 F.3d 693, 696 (7th Cir. 2020) (quoting *United States v. Ross*, 456 U.S. 798, 824 (1982)).  Thus, the Court is to "look to the *totality* of the circumstances to see if there is a fair probability that evidence of a crime will be found in a particular place." *Id.* (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

Here, the automobile exception is clearly applicable to the search of Defendant's vehicle. Sergeant Blodgett testified, and Defendant does not contest, that he smelled marijuana in Defendant's vehicle as he was conducting a proper traffic stop.  Still more, Defendant is heard on the Dash-Cam footage admitting to Sergeant Blodgett that someone had marijuana in the vehicle earlier that night, and later that there was a little marijuana in the vehicle.  As such, it was objectively reasonable for Sergeant Blodgett to believe that the vehicle contained evidence of a crime.  *See* Ind. Code. § 35-48-4-11 (making it illegal to knowingly or intentional possess

---

[6] As an initial matter, the undersigned again notes that Defendant is currently only charged with possessing a firearm as a felon and not with any narcotics-based offense.  Accordingly, Defendant's challenge to any evidence stemming from the search of his vehicle—i.e. the marijuana and paraphernalia—appears to be unnecessary or at least premature.  Furthermore, to the extent Defendant is seeking to bar the evidence obtained from the vehicle search at a future sentencing proceeding, that argument also seems to lack merit, as "the exclusionary rule does not bar the consideration at sentencing of evidence seized in violation of the Fourth Amendment." *United States v. Brimah*, 214 F.3d 854, 859 (7th Cir. 2000).

marijuana).  Indeed, courts throughout this circuit and the state of Indiana have consistently held as much.  *See, e.g., United States v. Paige*, 870 F.3d 693, 703 (7th Cir. 2017) ("[T]he officer also had probable cause to search the vehicle under the automobile exception, given the strong odor of marijuana in its proximity."); *United States v. Franklin*, 547 F.3d 726, 733 (7th Cir. 2008) ("A police officer who smells marijuana coming from a car has probable cause to search that car."); *Mosby*, 541 F.3d at 768-69 (collecting cases); *see also, e.g., Indiana v. Hawkins*, 766 N.E.2d 749, 752 (Ind. Ct. App. 2002) ("[W]e have no hesitation in deciding that when a trained and experienced police officer detects the strong and distinctive odor of burnt marijuana coming from a vehicle, the officer has probable cause to search the vehicle.").  Once Sergeant Blodgett had probable cause to search the vehicle, it was permissible for him to search any container or compartments—such as backpacks and the interior console—which might contain evidence of that crime.  *See United States v. Williams*, 627 F.3d 247, 251 (7th Cir. 2010) ("When probable cause exists to search a vehicle, law enforcement agents are permitted to search all parts of the vehicle in which contraband or evidence could be concealed, including closed compartments, containers, packages, and trunks."); *Kizart*, 967 F.3d at 699 (finding the automobile exception encompassed the search of a locked trunk and backpack found in the vehicle).

In his post-hearing reply, Defendant—relying on *United States v. Chadwick*, 433 U.S. 1, 11-12 (1977) and *United States v. Maddox*, 614 F.3d 1046, 1048-50 (9th Cir. 2010)—argues that "[o]fficers may not search closed containers in the interior of [a] vehicle stopped for a minor traffic violation when the driver has been secured, handcuffed and in the rear of the patrol vehicle."  (ECF 47 at 3).  He similarly relies on the Supreme Court's decision in *Arizona v. Gant*, in support of the contention that police may search "*only* the space [of the vehicle] within the

arrestee's 'immediate control' . . . .'" (ECF 45 at 5 (quoting *Gant*, 556 U.S. at 335)). Defendant's reliance on these cases, however, is misplaced.

The Supreme Court in *Chadwick*, for example, held that the reasoning behind the automobile exception did not apply where law enforcement waited to seize and search a footlocker—which they had probable cause to believe contained contraband—until after it was placed in an automobile. 433 U.S. at 14-16. What *Chadwick* did not do, however, was negate the ability of law enforcement to search a vehicle based upon probable cause. *See United State v. Johns*, 469 U.S. 478, 482-83 (1985) ("*Chadwick*, however, did not involve the [automobile] exception to the warrant requirement recognized in *Carroll v. United States* . . . .").

Further, the Courts in both *Maddox* and *Gant* found that the searches at issue were improper searches incident to a lawful arrest. *See Gant*, 556 U.S. at 335 ("Accordingly, we hold that [*New York v. Belton*, 453 U.S. 454 (1981)] does not authorize a vehicle search incident to a recent occupant's arrest after the arrestee has been secured and cannot access the interior of the vehicle. . . . [W]e also conclude that circumstances unique to the automobile context justify a search incident to arrest when it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle."); *Maddox*, 614 F.3d at 1048 ("Contrary to the dissent's opening description, this was *not* a search of Maddox's person incident to arrest. Maddox's person was handcuffed in the back of the squad car, incapable of either destroying evidence or presenting any threat to the arresting officer."). While the "search incident to arrest" exception to the warrant requirement is related to the automobile exception, they are distinct and separate. *See United States v. Edwards*, 769 F.3d 509, 514 (7th Cir. 2014). "The suspicion required for a vehicle search incident to arrest under *Gant* is keyed to the offense of arrest; the automobile exception is not tied to an arrest." *Id.*

11

Even if the search of Defendant's vehicle was not a proper search incident to arrest,[7] the automobile exception provides sufficient grounds to justify the ultimate search of the vehicle. Accordingly, the undersigned sees no reason to suppress any evidence obtained because of the vehicle search.

3. Length of Detention and Pat-Down

Defendant also contends that he was "ordered from his vehicle, unlawfully detained and was subjected to a pat down search, which was beyond the parameters of a routine traffic stop." (ECF 47 at 4). He similarly argues that Sergeant Blodgett failed to use the least restrictive means to "effectuate a stop and issue any infractions" and detained Defendant longer than was necessary to issue a citation. (*Id.*). As already discussed, Sergeant Blodgett ordered Defendant from his vehicle after smelling an odor of marijuana and after Defendant admitted that there was "a little" marijuana was in the car. While outside the vehicle, Sergeant Blodgett spoke to Defendant in a calm voice—while Defendant continued to disobey Sergeant Blodgett's order to end his call with his mother—and did not unholster his weapon, use any force against Defendant, or place him in handcuffs. In fact, Sergeant Blodgett's voice and demeanor did not change until after he placed his hand on the bulge in Defendant's pocket and recognized it as a firearm.

"A seizure for a traffic violation justifies a police investigation of that violation." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). Similar to an investigative stop pursuant

---

[7] It is not even clear that the search incident to arrest exception is inapplicable. Indeed, the Southern District of Indiana has held that the smell of marijuana in a vehicle, along with circumstances which suggest that the occupant knew of the existence of the contraband, is sufficient to establish probable cause to arrest the occupant for constructive possession of marijuana. *See Lessley v. City of Madison*, 654 F. Supp. 877, 894-95 (S.D. Ind. 2009). If Defendant was solely arrested for the traffic offenses, Sergeant Blodgett would have only been justified in searching the area in his immediate control or where evidence of the traffic offenses may be. However, as discussed in greater detail *infra*, while the firearm was what ultimately triggered Defendant's arrest, "the police can search a vehicle incident to arrest if they have reason to believe that the vehicle contains evidence of *any* of the offenses of arrest." *Edwards*, 769 F.3d at 515. Thus, because Defendant could have presumably been arrested for possession of marijuana, Sergeant Blodgett could search for evidence of that offense. *See Paige*, 870 F.3d at 702-03.

to *Terry v Ohio*, 392 U.S. 392 U.S. 1 (1968), "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop . . . and attend to related safety concerns." *Rodriguez*, 575 U.S at 354 (internal citations omitted). "Authority for the seizure ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id*. (citation omitted). But Defendant overlooks that the initial traffic stop was not a *Terry* stop based on "reasonable suspicion." Rather, the traffic stop was based on probable cause that Defendant had committed a traffic offense. As the Seventh Circuit has explained, "the fourth amendment does not require the release of a person arrested on probable cause at the earliest moment that step can be accomplished." *United States v. Childs*, 277 F.3d 947, 953-54 (7th Cir. 2002).

Here, prior to Defendant's eventual arrest, Sergeant Blodgett did not unreasonably delay the traffic stop. The total interaction between Defendant and Sergeant Blodgett, prior to when Defendant was handcuffed, took roughly six minutes. (Dash-Cam 20:56:00-21:02:00). During that time, the only questions asked by Sergeant Blodgett pertained to the traffic stop and the smell of marijuana. If anything prolonged the encounter, it was Defendant continuing to speak with his mother on the phone. In any event, the brief extension of time spent asking about the marijuana was not unreasonable. *See Childs*, 277 F.3d at 954 ("Officers ask persons stopped for traffic offenses whether they are committing any other crimes. That is not an unreasonable law-enforcement strategy, either in a given case or in gross; persons who do not like the question can decline to answer."). Further, the mere fact that Sergeant Blodgett had ordered Defendant from the vehicle did not change this. "During a valid traffic stop, an officer may order the driver and passengers out of the vehicle without violating the Fourth Amendment." *United States v. Tinnie*, 629 F.3d 749, 751 (7th Cir. 2011); *see also Maryland v. Wilson*, 519 U.S. 408, 410 (1997).

As discussed earlier, by the time Sergeant Blodgett ordered Defendant from the vehicle, he had already formulated probable cause to search the vehicle. Accordingly, the "mission" of the traffic stop had changed, and Sergeant Blodgett obviously would have had at least the reasonable suspicion ordinarily demanded to justify detaining an individual while conducting a search. *See United States v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005) ("Reasonable suspicion amounts to something less than probable cause but more than a hunch."); *see also Ross*, 456 U.S. at 801 (upholding a search pursuant to the automobile exception, conducted after the defendant had been ordered out of his vehicle); *Valance v. Wisel*, 110 F.3d 1269, 1276-77 (7th Cir. 1997) (finding that officers did not violate an arrestee's Fourth Amendment rights by continuing to detain him while conducting a limited *Terry* search of his vehicle, even after he had been issued a citation).

Finally, Defendant's contention that the "pat-down" was outside the scope of a normal traffic stop misses the point. Defendant is correct in arguing that even if he was properly detained, a pat-down may not have been warranted. Under *Terry* and its progeny, "[t]o justify a warrantless pat-down search without probable cause, the officer must also be able to point to specific and articulable facts indicating that the individual may be armed and present a risk of harm to the officer or to others." *United States v. Brown*, 188 F.3d 860, 864 (1999) "[T]he standard is whether the pat-down search is justified in the totality of the circumstances even if each individual indicator would not by itself justify the intrusion." *Id.*

That being said, the uncontradicted testimony at the suppression hearing—which is corroborated by the Dash-Cam footage—confirms that Sergeant Blodgett did not conduct a "pat-down" until he noticed the bulge in Defendant's pocket. Such protective measures were justified. The Supreme Court in *Pennsylvania v. Mimms* addressed substantially the same issue.

There, police ordered the defendant out of a vehicle after he had been stopped for driving without a license. 434 U.S. 106, 107 (1977). After the defendant exited the vehicle, the officer noticed a bulge in his sportscoat, and after conducting a protective pat-down, seized a .32-caliber revolver. *Id.* The Supreme Court held that the "bulge in the jacket permitted the officer to conclude that Mimms was armed and thus posed a serious and present danger to the safety of the officer." *Id.* at 112. The same is true here—given Sergeant Blodgett's observation of the bulge in Defendant's pocket, it was reasonable for him to believe Defendant was armed and to take actions to assuage those concerns. *See United States v. Winters*, No. 16-CR-146-JPS, 2017 WL 2703527, at *2 (E.D. Wis. June 22, 2017) ("Beland, given her observation of the bulge in Defendant's jacket, had reasonable suspicion that Defendant was carrying a firearm as of the time she seized him.").

In summary, just as Sergeant Blodgett was permitted to initiate the traffic stop, he was permitted to question Defendant about matters unrelated to the traffic stop—including the smell of marijuana. Further, Sergeant Blodgett was permitted to order Defendant from his vehicle and conduct a protective pat-down. Accordingly, the undersigned will turn to Defendant's final set of arguments—that Sergeant Blodgett violated his *Miranda* rights.

4.  *Miranda*

Defendant contends that he was subjected to un-*Mirandized* custodial interrogations "from the moment he encountered [Sergeant] Blodgett." (ECF 45 at 4). Broadly, Defendant's statements to Sergeant Blodgett and Officer Twill can be divided into three segments: (1) Defendant's statements prior to the pat-down, (2) Defendant's statements after he was handcuffed, and (3) Defendant's statements in the squad car after he was read his *Miranda*

warnings. Because the *Miranda* inquiry is context specific, the undersigned will address each set of statements in turn.

"In the seminal case of *Miranda*, the United States Supreme Court held that 'the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.'" *United States v. Patterson*, 826 F.3d 450, 454 (7th Cir. 2016) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). "The *Miranda* Court recognized that the inherently coercive nature of custodial interrogation could blur the line between voluntary and involuntary statements, and that the prophylactic measures were necessary to protect the constitutional right." *United States v. Ambrose*, 668 F.3d 943, 954 (7th Cir. 2012) (citing *J.D.B. v. North Carolina*, 564 U.S. 261, 299 (2011)).

*Miranda*, however, does not apply to all statements made to law enforcement, but only those made as a result of "custodial interrogation." *See id*. ("The privilege against self-incrimination is not imperiled by every conversation with the government."). "Accordingly, a suspect must be both in custody and subjected to interrogation before *Miranda* warnings are required." *Id.* (citing *Berkemer v. McCarty*, 468 U.S. 420, 428 (1984); *Miranda*, 384 U.S. at 444; *United States v. Barker*, 467 F.3d 625, 628 (7th Cir. 2016)); *see also Patterson*, 826 F.3d at 454.

"Custody" in the context of *Miranda*, "is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508-09 (2012). As an initial step, the Court is to determine, whether, in light of "the objective circumstances of the interrogation, a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* (alteration in original) (internal quotation

marks omitted) (first quoting *Stansbury v. California*, 511 U.S. 318 (1994); and then quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)).  Further, in order to so determine, the Court is to examine "all of the circumstances surrounding the interrogation" including but not limited to: (1) its duration, (2) its location, (3) statements made during the interview, (4) the presence or absence of physical restraints during the questioning, and (5) the release of the interviewee at the end of the questioning.  *See id*. at 509 (listing cases); *Patterson*, 826 F.3d at 455.  Still more factors to consider include:

> whether the encounter occurred in a public place; whether the suspect consented to speak with the officers; whether the officers informed the individual that he was not under arrest and was free to leave; whether the individual was moved to another area; whether there was a threatening presence of several officers and a display of weapons or physical force; and whether the officers' tone of voice was such that their requests were likely to be obeyed.

*Patterson,* 826 F.3d at 455 (citations omitted).

"[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).  Whether a question or action is "reasonably likely to elicit an incriminating response" is determined by whether a "reasonable objective observer would have believed" the question or action would do so.  *United States v. Westbrook*, 125 F.3d 996, 1002 (7th Cir. 1997).  An "incriminating response" is a response "that the *prosecution* may seek to introduce at trial." *Rhode Island v. Innis,* 446 U.S. 291, 302 n.5 (1980).  There are, however, certain exceptions to this rule.  Under the "public safety exception," for example, police are permitted to ask "questions necessary to

secure their own safety or the safety of the public." *Quarles v. New York*, 467 U.S. 649, 659 (1984).

Defendant argues that he "was in custody prior to being asked to exit his vehicle, and any statements made thereafter were subject of a custodial interrogation and *Miranda* warnings [were] required." (ECF 45 at 5). Defendant ignores, however, that the Supreme Court has held that in light of the relatively "noncoercive aspect of ordinary traffic stops . . . . persons temporarily detained pursuant to such stops are not 'in custody' for purposes of Miranda." *Berkemer*, 468 U.S. at 440. While the Court also held that if a motorist "is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by Miranda," *id.*, Defendant points to no factors that suggest the stop here rose to that level. At all times prior to the pat-down, Sergeant Blodgett was the only officer on the scene, spoke with a calm voice, and never unholstered his firearm. Similarly, the entire interaction occurred in a public location, and at no point—prior to the seizure of the firearm—was Defendant physically restrained or taken to another area. While Sergeant Blodgett did order Defendant out of the vehicle, as already mentioned, this was permissible as part of a routine traffic stop and does not necessarily transform the nature of the stop. Indeed, the officer in *Berkemer* after initially stopping the defendant for weaving in traffic, ordered the defendant out of the vehicle before questioning him about drug and alcohol use.[8] *Berkemer*, 482 U.S. at 423; *see also United States v. Kelly*, 991 F.2d 1308, 1312 (7th Cir. 1993) (finding the roadside questioning of a driver stopped for speeding about drug use was not custodial interrogation).

---

[8] Arguably, Defendant was in custody when Sergeant Blodgett first asked him about the bulge during the pat-down. *See United States v. Richardson*, 700 F. Supp. 2d 1040, 1052-53 (N.D. Ind. 2010). That being said, Defendant's statement—"Mom, I'm going to jail"—was made to his mother, not in response to Sergeant Blodgett's question—"What's this?" As such, the statement is admissible as a volunteered statement. *See Miranda*, 384 U.S. at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.").

Arguably Defendant was "in custody" following the pat-down—Sergeant Blodgett's tone became more hostile, Defendant was placed into handcuffs, and was placed in the back seat of the squad car. Defendant, however, does not identify which statements he made after this point that he wishes to suppress or advance any theory in support of suppression besides that he was in custody and subjected to interrogation. Nor does he explain how any such statements are material to this prosecution. *See United States v. Randle*, 966 F.2d 1209, 1212 (7th 1992) ("A defendant who seeks to suppress evidence bears the burden of making a prima facie showing of illegality. Reliance on vague, conclusory allegations is insufficient." (internal citation omitted)). Regardless, the only questions Sergeant Blodgett seems to have asked from after Defendant was handcuffed until after until he was *Mirandized* were: (1) whether the firearm was loaded, (2) whether Defendant noticed Sergeant Blodgett pull behind him, and (3) whether Defendant had been "in trouble before." As to the first question, whether or not Sergeant Blodgett was handling a loaded firearm would seem to fall squarely within the public safety exception. As to the second question, there is nothing inherently incriminating about when Defendant first realized Sergeant Blodgett was behind him or any foreseeable reason why the prosecution would seek to introduce it at trial. The same could be said about Defendant's response to Sergeant Blodgett's question of whether he had been "in trouble." Accordingly, Defendant was not subjected to interrogation at this time. Further, while Defendant was eventually questioned in the squad car, by that point Officer Straw had already read Defendant his *Miranda* warnings. (Tr. 2-23, 30).

As such, at no point during the encounter does it appear that Defendant was subjected to un-*Mirandized* custodial interrogations. Accordingly, there is nothing to suppress on *Miranda* grounds either.

*D. Conclusion*

For the above reasons, I CONCLUDE that Sergeant Blodgett did not subject Defendant or his vehicle to any unreasonable search or seizure. I further CONCLUDE that Defendant did not make any statements in response to an improper custodial interrogation. I therefore RECOMMEND that Defendant's motion to suppress (ECF 23) be DENIED.

The Clerk is directed to send a copy of this Report and Recommendation to counsel for the parties. NOTICE IS HEREBY GIVEN that within fourteen days after being served with a copy of this recommended disposition, a party may serve and file specific, written objections to the proposed findings and recommendations. Fed. R. Crim. P. 59(b)(2). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.

Entered this 25th day of March 2021.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge